RECORD NO. 21-1396(L) and 21-1397

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

CHARLES WILLIS SHORT, individually and as Administrator of the
Estate of VICTORIA CHRISTINE SHORT,

Appellant

vs.

J.D. HARTMAN, SHERIFF OF DAVIE COUNTY, in his individual and
official capacity; ANDREW C. STOKES, SHERIFF of DAVIE COUNTY in
his individual and official capacity; CAMERON SLOAN, CAPTAIN,
Chief Jailer with the Davie County Sherriff's Department, in his
individual and official capacity; DANA RECKTENWALD, LIEUTENANT,
Operations Supervisor of the Detention Center with the Davie
County Sheriff's Department, in her individual and official
capacity; TERESA MORGAN a/k/a TERESA M. GODBEY, SERGEANT Jailer-
Detention Officer with the Davie County Sheriff's Department, in
her individual and official capacity; CRYSTAL MEADOWS, SERGEANT
Detention Officer with the Davie County Sheriff's Department in
her individual and official capacity; MATTHEW TRAVIS BOGER,
Jailer-Detention Officer with the Davie County Sherriff's
Department, in his individual and official capacity; and WESTERN
SURETY COMPANY,

Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____

OPENING BRIEF OF APPELLANT
CHARLES WILLIS SHORT

_____

W. Ellis Boyle, Esquire
Knott & Boyle, PLLC
4800 Six Forks Road, Suite 100
Raleigh, NC 27609
(919)783-5900
ellis@knottboyle.com
*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1396        Caption: Short v. J.D. Hartman, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Charles Willis Short, individually and as Administrator of the Estate of Victoria Christine Short
(name of party/amicus)

who is _____Appellant_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?        ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ W. Ellis Boyle                    Date:    April 16, 2021

Counsel for: Plaintiff-Appellant Short

Print to PDF for Filing

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Cases and Authorities........................ii

Statement of Jurisdiction.............................1

Issue.................................................1

Statement of the Case.................................1

Statement of the Facts................................4

Summary of the Argument..............................17

Argument.............................................18

Conclusion...........................................30

Certificate of Compliance............................32

Certificate of Service...............................33

## TABLE OF CASES AND AUTHORITIES

Page

**CASES**

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)..............26

Bell Atlantic Corp. v. Twombly,
    550 U.S. 554, 570 (2007)...........................26

Booker v. S.C. Dep't of Corr.,
    855 F.3d 533, 546 (4th Cir. 2017)..................23

Brown v. Harris,
    240 F.3d 383, 389 (4th Cir. 2001)..................20

Edwards v. City of Goldsboro,
    178 F.3d 231, 244(4th Cir. 1999)...................19

Gordon v. Kidd,
    971 F.2d 1087, 1094 (4th Cir. 1992)................20

Gordon v. Schilling,
    937 F.3d 348, 356 (4th Cir. 2019)..............20, 21

Iko v. Shreve,
    535 F.3d 225, 241-43 (4th Cir. 2008)...............23

Mays v. Sprinkle,
    992 F.3d 295, 299-300 (4th Cir. 2021).......19, 22, 25

Monell v. N.Y. City Dep't of Soc. Servs.,
    436 U.S. 658, 690-91(1978)...................3, 18, 30

Thompson v. City of Charlotte,
    No. 3:20-CV-370-MOC-DSC,
    2020 WL 7033966 (W.D.N.C. Nov. 30, 2020)...........20

**STATUTES**

28 U.S.C. 1291.........................................1

28 U.S.C. 1331.........................................1

42 U.S.C. 1983....................................passim

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUE

DID THE DISTRICT COURT ERR IN GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS FOR THE INDIVIDUAL CAPACITY DELIBERATE INDIFFERENCE CLAIM AGAINST SGT. MORGAN UNDER 42 U.S.C. § 1983 AFTER ALL DISCOVERY WAS COMPLETED AND SUMMARY JUDGMENT WAS PENDING?[1]

## STATEMENT OF THE CASE

On August 29, 2018, Plaintiff Charles Short, acting as Administrator of the Estate of Victoria Short, his deceased wife, filed a Complaint against individual employees of the Davie County Sheriff's Department or its Detention Center ("Jail") and against the Department itself alleging violations of 42 U.S.C. § 1983 and state law claims.[2] (App. pp. 22-128 and 129-237). Defendants filed an Answer on December 7, 2018. (App. pp. 238-271).

The district court entered a Discovery Scheduling Order on January 29, 2019. (App. p. 298). The original end date for discovery was December 13, 2019, but the Court extended that date a few times until discovery actually closed on July 24, 2020.

_____

[1] Discovery led Plaintiff to conclude that he lacks admissible evidence to prove 42 U.S.C. § 1983 claims against Defendants Boger, Sloan, Meadows, Hartman, and Recktenwald in their individual capacity, so he agreed to the dismissal of those individual capacity 1983 claims in his summary judgment response brief and does not appeal the dismissal of those claims.

[2] The claims against medical providers have been dismissed.

Discovery ensued for over a year and a half. The parties exchanged several rounds of written discovery along with taking approximately 28 depositions.

On September 24, 2019, over six months into discovery and ten months after filing their Answer, Defendants filed a Motion for Judgment on the Pleadings. (App. pp. 401-404). On November 8, 2019, both parties' briefs on Defendants' Motion for Judgment on the Pleadings were submitted to the district court. (App. p. 11). Over the next eight months leading up to the close of discovery in July 2020, several more depositions occurred, additional written discovery was exchanged, and the district court heard discovery motions.

On July 27, 2020, Defendants filed a Notice of Intent to File Dispositive Motions. (App. p. 15). On September 14, 2020, almost a year after filing the Motion for Judgment on the Pleadings, Defendants filed eight separate Motions for Summary Judgment along with a consolidated Joint Appendix. (App. pp. 479-1009). On November 18, 2020, over a year after the Motion for Judgment on the Pleadings had been submitted to the district court, Plaintiff filed a consolidated response, which included 35 exhibits, to all eight of Defendants' Motions for Summary Judgment. (App. pp. 1010-1631). On January 19, 2021, the fully-briefed Motions for Summary Judgement were submitted to the district court. (App. p. 20).

On February 17, 2021, the Honorable N. Carlton Tilley, Jr., Senior United States District Judge, granted Defendants' Motion for Judgment on the Pleadings without addressing the parties' pending briefs on summary judgment. (App. pp. 1874-1904). In its Order, the district court ruled that Plaintiff failed to state a claim against any individual defendant under 42 U.S.C. § 1983 and dismissed the claims against the individual Defendants. The district court also concluded that, without any underlying claim against an individual, the official capacity Monell claim against the Department failed. The district court specifically did not consider or rule on qualified immunity issues, so those are not on appeal. The district court chose not to exercise pendent or supplemental jurisdiction over the state law claims, so there is no substantive issue related to them on appeal.[3]

On March 3, 2021, Plaintiff filed a Motion to Reconsider. (App. pp. 1905-1923). On March 10, 2021, Plaintiff timely filed notice of appeal of the Order granting the Motion for Judgment on the Pleadings. (App. pp. 1924-1926). On April 9, 2021, the district court denied the Motion to Reconsider. (App. pp. 1944-1951). On April 9, 2021, Plaintiff timely filed notice of appeal of the Order denying the Motion to Reconsider. (App. pp. 1952-1954).

---

[3] To the extent that it needs to be included in any order from this Court, if he succeeds in this appeal, Plaintiff does intend to pursue these state law claims upon remand.

3

## STATEMENT OF THE FACTS

In his Amended Complaint, Plaintiff alleged that Sgt. Morgan knew that Ms. Short had recently attempted suicide and spent time in the hospital for related treatment, was intoxicated or going through withdrawal, and had a mental health screening form result that met the criteria for special observation and direct contact with a qualified mental health professional ("QMHP") to initiate the suicide risk and prevention evaluation process. Sgt. Morgan ignored these facts and, without any reasonable justification, failed to do what she should have done. (App. pp. 151-154, 164-169).

Plaintiff alleged that: "Based on the proper application of the instructions, Sgt. Morgan should have referred Victoria for further mental health evaluation. For some inexplicable reason, she did not." (App. p. 153).

Plaintiff alleged that Sgt. Morgan:

failed to check this box in spite of all of the earlier indications that Victoria was in fact under the influence of both drugs and alcohol starting with 1) Deputy Moxley's report at the house; then followed by 2) LPN Barnes recorded observations at the Jail, and then 3) even with Sgt. Morgan's own notation on the other questionnaire form that she filled out, presumably, contemporaneously with this form. Sgt. Morgan either chose to not pay attention to this safety measure when she should have been doing her job, or even worse, she paid attention, but simply did not care, and chose to ignore the simple instructions. Either way, Sgt. Morgan's choice led to Victoria's death.

(App. pp. 153-154).

4

Plaintiff alleged that Sgt. Morgan knew that Ms. Short had signs and indications of a risk of suicide that required her to place Ms. Short on suicide watch, notify a QMHP and the nurse, and ensure that the detainee is not given a bedsheet. (App. pp. 154, 165-169).

Plaintiff alleged that Sgt. Morgan's actions violated Ms. Short's constitutional rights, why her actions violated Ms. Short's constitutional rights, and how that led to Ms. Short's harm. (App. pp. 177-181). Specifically, Plaintiff alleged that Sgt. Morgan failed to follow and execute the policies for suicide prevention, failed to comply with applicable law and code provisions, and failed to complete her assigned duties which led to Ms. Short's suicide. (App. pp. 178-181).

Plaintiff would not typically include facts developed in discovery in the "facts section" of a brief appealing a dismissal from a motion to dismiss. However, this case presents an unusual procedural posture where the district court had all of these facts and admissible evidence in the form of briefs filed and submitted for consideration for a month before it ruled on the 17-month-old motion to dismiss. These facts and admissible evidence come from Plaintiff's Response to Defendants' Motion for Summary Judgment and merely add context to or clarify Plaintiff's allegations from the Amended Complaint with specific details gleaned through

discovery; details that are not available before filing a lawsuit.[4]
(App. pp. 1010-1051).

All detention officers should have completed a Detention
Officer Certification Course which includes a specific 5-hour
training session titled Suicides and Crisis Management. Part of
the curriculum in that course instructs officers that there are
certain high-risk suicide periods for inmates including: 1) the
first 24 hours of confinement; 2) intoxication/withdrawal/sobering
up; and 3) a cluster effect when an inmate has recently, within
the past 90 days, attempted suicide. (App. pp. 1063-1065). Officers
are taught "It is imperative that each agency have some suicide
prevention process including a screening form that is developed
for their particular facility and that there are policies and
procedures which address its use and application." (App. pp. 1082,
1127-1135, 1137-1145). Sgt. Morgan took that training before
August 2016.

Sheriff Stokes issued Policy 4.10 for the Jail in 2007 that
remained in effect in August 2016. (App. pp. 1183-1186). The Policy
requires officers and nurses to proactively look for risk factors
and identify if an inmate is at risk for suicide during intake. If
an inmate has risks, officers and nurses must ensure that the
inmate is closely observed to prevent suicide until evaluated and

---

[4] Sgt. Morgan knew what she did when she did it, before Plaintiff
could compel her to reveal information in discovery.

cleared of the need for such procedures by a doctor. Specifically,
"[a]ll detention officers will learn the signs of a suicidal inmate
and respond to their needs. Inmates will be screened, classified,
and supervised in order to reduce the possibility of suicides in
the [Jail]."

The Sheriff defines these risks as:

[t]he following may indicate that an inmate is
considering suicide, although [Jail nurses] and
detention officers should look carefully for any other
indicators of potentially suicidal behavior"

1) currently making suicidal threats;

2) prior suicide attempt;

3) depression which might be revealed by crying;

4) alcohol or drug intoxication or withdrawal;

5) signs of serious mental health problems; or

6) history of mental illness.

The Sheriff also requires nurses and officers to closely observe
inmates during high-risk periods including:

1) the first 24 hours of confinement;

2) after receiving bad news from home like marital problems;

3) before and after court appearances;

4) during poor physical health; or

5) during intoxication or withdrawal.

After properly identifying an at-risk inmate using these risk
factors, the officers should

7

1) place the inmate in a populated cell;

2) never place her in a single cell;

3) notify the nurse;

4) begin 10-15-minute checks and log them "**It is important to begin 10-15-minute checks on suicidal inmate, even if he or she is in a multi-occupant cell. This must be documented**" (emphasis in original); and

5) remove all items that the inmate could use to commit suicide like bedsheets and belts or razor blades.

(App. pp. 1201-1203).

The next step is for a QMHP at Daymark (the outside mental health provider for the Jail) to evaluate the inmate. The nurse is required to tell the QMHP all of the relevant information about the inmate so that the QMHP can provide a written recommendation of proper care for the inmate to the nurse and officers. Again, the Policy emphasizes the following: "**NOTE: The precautions will continue until lifted by the [Jail] doctor. A copy of the doctor's report must be put into the inmate's confinement record and his or her medical file**."

The Sheriff explicitly distinguished the Jail nurse from both the doctor and the QMHP. Only the QMHP at Daymark could properly evaluate an at-risk inmate, not the Jail nurse. Only the doctor could properly release an at-risk inmate from suicide watch or precautions, not the Jail nurse. (App. pp. 1219-1223, 1241-1243). Basically, the Jail nurse was only meant to pass along the message to the QMHP, the doctor, or both.

8

When an officer processed an inmate during booking, the officer completed a mental health screening form. (App. p. 1249). If the score on the mental health screening form revealed a positive screen, then the inmate required further mental health evaluation from a QMHP at Daymark. A mental health screening form could be positive in any one or more of three ways: 1) if the officer marked a "yes" as the answer for any two questions for questions 1-6; 2) if the officer marked a "yes" for question 7; or 3) if the officer marked a "yes" for question 8.

The Jail's policy and practice in August 2016 required the officer, or the supervisor on duty at the time, to notify the nurse about the positive screen so that the nurse would call the QMHP at Daymark. The nurse worked a 12-hour shift from 7 a.m. to 7 p.m. If no nurse was on duty when an inmate had a positive screen, the officer or supervisor on duty must directly notify a QMHP at Daymark. Even if a nurse was on duty when an inmate had a positive screen, the supervisor must actually notify the nurse about it, not just place the mental health screening form in a box at the nurse's station. The nurse could not call Daymark for the mental health evaluation if the supervisor did not make her aware that it existed. In fact, even after giving the form to the nurse, the supervisor must follow up with the nurse to confirm that the nurse actually called Daymark. (App. pp. 1146-1155, 1173-1174, 1263-1280, 1304-1305, 1308-1320,).

9

Either way, if an officer recorded a positive screen during an inmate's booking process, the policy required that the officer alert his or her supervisor and place the inmate on suicide watch until a proper mental health evaluation by a QMHP occurred. (App. pp. 1184-1186, 1304-1305). After that, the doctor would either clear the inmate from the watch or give specific instructions on how to observe and treat the at-risk inmate. These actions would be based on the doctor's written medical orders. (App. pp. 1184-1186).

On August 23, 2016, Nurse Barnes worked a day shift starting at 7 a.m. According to all of the testimony and facts developed during discovery, no nurse worked at the Jail from midnight to 7:00 a.m. on August 23.[5]

Sgt. Morgan booked Ms. Short around 1:00 or 2:00 a.m. on August 23. Sgt. Morgan completed the mental health screen form for Ms. Short at 1:30 a.m. Sgt. Morgan marked the answer to both questions 5 and 6 as a "yes." While she marked the answer to question 8, "Have you ever been in a hospital for emotional or

---

[5] The issue of when Nurse Barnes saw Ms. Short was important under the district court's initial Order granting Defendants' Motion for Judgment on the Pleadings. (App. p. 1895). In both the Amended Complaint and Defendants' Answer, the non-health care provider parties confused the time of "12:06" that Nurse Barnes wrote on the medical form she filled out for Ms. Short as being around midnight instead of its actual time, around noon. However, in its Order denying Plaintiff's Motion to Reconsider, the district court stated that it did not consider that timing issue to be important to its ruling. (App. p. 1950).

mental health problems?" as a "no," Sgt. Morgan wrote in the comments section "when I [Victoria Short] tryed to commit suicide stayed in hospital 4 days." Sgt. Morgan should have considered the response to question 8 to be a "yes," even if she marked it as a "no" on the form. (App. pp. 1344-1345, 1366, 1372). Sgt. Morgan failed to check the box on the form that asked if Ms. Short was "under the influence of drugs/alcohol" despite ample evidence of either intoxication or withdrawal, or both.

There are 2 boxes at the bottom of the form that state: "not referred" or "referred on date ____ to _____." The officer filling out this form must choose one or the other. (App. pp. 1395-1396). According to the self-explanatory instructions on the form and the then existing policy or practice, Sgt. Morgan should have affirmatively referred Ms. Short for further mental health evaluation because Ms. Short answered "yes" on 2 questions from 1-6 and because Sgt. Morgan should have considered the answer to question 8 a "yes." (App. pp. 1229-1231, 1364-1367, 1373,1395-1396). Either of those two scenarios should have led Sgt. Morgan to consider this a positive mental health screen. She should have checked the referred box and sent Ms. Short for further mental health evaluation by a QMHP. Instead, Sgt. Morgan neglected to check either box.

Even if a nurse had seen the mental health screening form, Sgt. Morgan left the "referred" portion blank so the nurse had no

11

warning that it was a positive screen. While the nurse marked the front of Ms. Short's medical questionnaire, no extrinsic evidence exists that a nurse ever received the mental health screening form. (App. pp. 1156-1157, 1397-1398). Sgt. Morgan did not mark the mental health screening form to suggest that she gave it to a nurse. (App. pp. 1412-1413).

Sgt. Morgan also completed the intake medical questionnaire for Ms. Short during the intake process. Sgt. Morgan asked the questions on this form as written. (App. pp. 1411-1412, 1432-1435). None of the questions on the intake medical questionnaire specifically ask if an inmate is currently considering suicide or having thoughts of self-harm. (App. pp. 1283-1286, 1301-1302, 1333, 1380-1381). Sgt. Morgan never specifically asked if Ms. Short had current thoughts of suicide or self-harm. (App. pp. 1411-1413).

In response to question 13 on that form: "Have you ever considered or attempted suicide? If yes explain:," Sgt. Morgan wrote: "Yes LAST MONTH." (App. p. 1437). Ms. Short told Sgt. Morgan that she tried to commit suicide last month. (App. p. 1404). This corroborates Ms. Short's response to question 8 on the mental health screening form, and further shows why Sgt. Morgan should have marked that question 8 as a "yes."

In response to question 20, "Does the inmate exhibit any signs that suggest the risk of suicide, assault, or abnormal behavior?"

12

Sgt Morgan wrote "No." Ample evidence of the existence of several of the risk factors from Policy 4.10 described above directly contradicts Sgt. Morgan's response. At a minimum, Sgt. Morgan knew about Ms. Short's very recent prior suicide attempt, she wrote information about that in the forms. Also, Sgt. Morgan could plainly see that Ms. Short obviously displayed intoxication or withdrawal symptoms.

Officer Frye witnessed Ms. Short's July 6 suicide attempt as a volunteer fireman responding to that call at her house. He also worked at the Jail for Sgt. Morgan. He was working with Sgt. Morgan on August 23 when she did the intake of Ms. Short. He told Sgt. Morgan that Ms. Short had attempted suicide about 6 weeks earlier. (App. pp. 1203, 1401-1402, 1442-1443). This further shows Sgt. Morgan's overt, contemporaneous awareness of Ms. Short's very recent prior suicide attempt.

Sgt. Morgan created a special observation form for Ms. Short in the early morning of August 23.[6] (App. p. 1445). This form was pre-printed as being a "15-minute observation" but someone, presumably Sgt. Morgan, crossed out the number "15" and hand wrote in the number "30" instead. This was a violation of policy. (App. pp. 1287-1288, 1336-1337, 1452).

---

[6] While Sgt. Morgan did not specifically recall doing this, the first time written on the sheet said 1:48 a.m. which was around the time Sgt. Morgan was booking Ms. Short into the Jail and the entry states "in booking."

Sgt. Morgan wrote "Possibly withdrawing" as the reason for this special observation. (App. pp. 1204-1205). She did not write anything about mental health issues or possible suicide risks. (App. pp. 1334-1336, 1400). Several detention officers and supervisors at the Jail wrote short entries that all say "ok" or "All ok" or some other non-specific description of Ms. Short's appearance and behavior. They did not "actually record inmate's behavior and give information which can be used to assess the inmate's mental health." (App. p. 1090).

Lt. Recktenwald wrote "watch ended cleared by nurse" on the form at 12:16 p.m. No nurse ever wrote anything on it. This form provides no evidence that anyone ever told the nurse about the risks of suicide Sgt. Morgan observed during intake. Nobody told the nurse anything about Ms. Short's risks of suicide that Sgt. Morgan observed during intake. (App. pp. 1492-1496).

No QMHP from Daymark, or anywhere else, ever evaluated Ms. Short. No doctor ever wrote a report that lifted the suicide watch or precautions that should have been in place for Ms. Short. What a nurse might say about clearing an inmate off of a 30-minute observation for "possibly withdrawing" has nothing to do with what Policy 4.10 required for an inmate like Ms. Short, who overtly displayed several suicide risks. (App. pp. 1184-1186).

No nurse was on duty when Sgt. Morgan completed the intake forms and observed Ms. Short exhibiting several suicide risks.

14

Sgt. Morgan should have made a direct call to Daymark right then as soon as she became aware of Ms. Short's several suicide risks. (App. pp. 1321-1326). If she had, that would have completely changed the evaluation, care, and observation that would have saved Ms. Short's life. Sgt. Morgan never called a QMHP, nor anyone else at Daymark, to report Ms. Short's positive mental health screen.

Sgt. Morgan did not notify the Jail nurse about Ms. Short's positive mental health screen when the nurse came on duty that morning at 7:00 a.m., which was also when Sgt. Morgan's shift ended. (App. pp. 1407-1409, 1491, 1494). As the supervisor, and also the officer who obtained a positive mental health screen, Sgt. Morgan had an obligation to tell the nurse to call Daymark. Sgt. Morgan also had an obligation to follow up and ensure the nurse had in fact made that call to Daymark to obtain a proper evaluation for Ms. Short. Instead of doing this, Sgt. Morgan did not even properly fill out the mental health screening form to note that Ms. Short should be referred. (App. pp. 1405-1409).

Based on the positive mental health screen and the existence of 4-6 suicide risks from Policy 4.10, Sgt. Morgan should have placed Ms. Short on suicide watch or at least some type of mental health or suicide precaution or observation. (App. pp. 1179-1182, 1232-1237, 1327-1332, 1368-1369, 1390-1392, 1427-1430, 1482-1487). Sgt. Morgan did not place Ms. Short on suicide watch or any other

15

type of mental health or suicide related precaution or observation.
(App. pp. 1218-1220, 1399-1400).

Sgt. Morgan did not tell the incoming sergeant at 7:00 a.m.
on August 23 about Ms. Short's overt suicide risks. (App. pp. 1413-
1415). Sgt. Morgan did not tell Lt. Recktenwald or anyone else
about Ms. Short's overt suicide risks. Sgt. Morgan failed to make
any notation on any form or paperwork to alert anyone at the Jail
of Ms. Short's overt suicide risks. (App. pp. 1281-1282).

The Sheriff and several of his employees testified that there
was little to no training on any of his policies. (App. pp. 1226-
1229, 1448-1451, 1522-1526,). Several of the detention officers
and supervisors testified that they had not reviewed the suicide
policy 4.10 for several years before Ms. Short's suicide in August
2016. (App. pp. 1125-1126, 1363, 1402-1403, 1416-1425). Officer
Boger testified at his deposition in 2019 that he had never even
seen it at all before he received a copy of it during his
deposition. (App. pp. 1118-1124, 1374-1379, 1388-1389).

The Sheriff's and his employees' testimony show that there
was, and continues to be, a serious deficit in training Jail staff
on the policies and procedures related to suicide risk
identification and prevention and the use of the mental health
screening form. This lack of training directly led to Ms. Short's
suicide. They failed to identify her suicide risks from the policy.
They failed to take the proper steps to obtain an evaluation. They

failed to put her on suicide watch or some sort of heightened observation until a QMHP and the doctor cleared her.

Since 2007, Sheriff Stokes had a written policy that stated Jail staff shall conduct observations using an electronic wand device to record information throughout the Jail. (App. p. 1536). In reality, the Jail has no such computerized wand system. Instead, the staff write down rudimentary observation information in a spiral notebook. (App. pp. 1162-1166, 1171-1172, 1206-1207, 1462-1464, 1465-1468, 1527-1530).

The Sheriff's training policy states that, within 30 days of hiring, every newly-hired detention officer will be trained on tasks documented on a training checklist. (App. pp. 1539-1548). In reality, no record exists to show that any Jail employee has ever been trained on any of the Sheriff's policies. (App. pp. 1105-1117, 1197-1199, 1252-1263, 1453-1456, 1459-1461).

## SUMMARY OF THE ARGUMENT

The district court erred because Plaintiff properly alleged a plausible claim for relief under § 1983 against Sgt. Morgan. Plaintiff pleaded that Sgt. Morgan had actual knowledge of Ms. Short's suicide risks and unreasonably ignored those risks, which was at least a direct cause of Ms. Short's avoidable suicide. This claim should proceed, at a minimum, beyond the pleadings.

These are not simply theoretical allegations that a district court must take as true when considering a motion to dismiss.

17

During the summary judgment process, Plaintiff provided the district court with admissible evidence that a Jury could rely on to find Sgt. Morgan liable. This evidence supports a finding that Sgt. Morgan failed to send Ms. Short for appropriate treatment and evaluation by a QMHP after knowing about Ms. Short's history and suicide risks. Sgt. Morgan is responsible for her failures that directly led, at least in part, to Ms. Short's death.

This Court should reverse and allow Plaintiff to pursue his claim against Sgt. Morgan as an individual for her violations of Ms. Short's constitutional rights. As an additional consequence, his <u>Monell</u> claim against the Department and state law claims against all Defendants should also proceed.

**ARGUMENT**

The only issue on appeal is this: did Plaintiff allege enough facts to put Sgt. Morgan on notice of plausible claims against her?[7] Plaintiff included specific facts about what Sgt. Morgan knew, when she knew it, why her actions violated Ms. Short's constitutional rights, and how that led to Ms. Short's harm. (App. pp. 151-154, 164-170, 177-181). The allegations put Sgt. Morgan on

---

[7] The district court's dismissal of the <u>Monell</u> claim and decision not to exercise supplemental or pendent jurisdiction over the state claims flowed directly from its decision on that solitary issue about the individual claim against Sgt. Morgan. If this Court reverses the district court's decision on that single issue, then all of those other claims should be revived on remand. Also, the district court did not reach any decision on qualified immunity, so that is not an issue on appeal before this Court.

notice of a plausible scenario of the basic claims against her. Indeed, the allegations about how she acted during the booking process are quite detailed and have been fleshed out even further by admissible evidence at the summary judgment phase.

The Court should review the granting of a motion for judgment on the pleadings de novo, the same as it does for a Rule 12(b)(6) motion. See Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). A court "should only [grant a Rule 12(b)(6) or 12(c) motion] if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Id.

Indeed, this Court has held that a trial court should be particularly accommodating to a plaintiff when considering a motion to dismiss a 42 U.S.C. § 1983 claim:

> When a court considers this type of motion testing the sufficiency of a civil rights complaint, "we must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged."

Id. see also Mays v. Sprinkle, 992 F.3d 295, 299-300 (4th Cir. 2021).

19

The district court misapplied its obligation to take the allegations in the Amended Complaint in the light most favorable to Plaintiff. Plaintiff needed to plead two things:

> [T]o succeed on a deliberate indifference claim, the plaintiff is required to prove an objective component and a subjective component. That is, the plaintiff must demonstrate that the defendant prison official acted with "deliberate indifference" (the subjective component) to the plaintiff's "serious medical needs" (the objective component). The objective component of a deliberate indifference claim is satisfied by a serious medical condition.

Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019)(internal citations omitted). Since Plaintiff gave Sgt. Morgan fair notice of the claims and grounds of the claims against her in the Amended Complaint, the district court should have denied the Motion.

For decades it is and has been well-settled law that an inmate who poses a risk of suicide in a jail satisfies the objective component and has a serious medical need. See Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (citing Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992)); See also Thompson v. City of Charlotte, No. 3:20-CV-370-MOC-DSC, 2020 WL 7033966, at *6 (W.D.N.C. Nov. 30, 2020)(A district court gave proper inferences to plaintiff and denied motion to dismiss jail suicide claim where defendants allegedly failed to follow the proper process once becoming aware that the detainee was potentially suicidal.). The district court agreed that Plaintiff cleared this objective component part of the 2-part test. (App. p. 1892).

The next step involves the allegations of the subjective component:

> In the context of a claim related to the denial of medical treatment, a defendant "acts with deliberate indifference if he had actual knowledge of the [plaintiff's] serious medical needs and the related risks, but nevertheless disregarded them." A defendant's subjective knowledge can be proven "through direct evidence of [his] actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that [he] knew of a substantial risk from the very fact that the risk was obvious.

Gordon, 937 F.3d at 356-57 (citations omitted). The district court seemed to acknowledge that Plaintiff pleaded that Sgt. Morgan knew Ms. Short had an elevated risk of suicide and the reasonable reaction to that was to send her for proper evaluation while safely observing her. (App. p. 1895).

Applying the appropriate standard to view all facts and draw all inferences in the best light for Plaintiff, the district court either correctly drew that conclusion or should have. At a minimum, the district court acknowledged that, in the Amended Complaint, Plaintiff alleged that Sgt. Morgan failed to take reasonable steps after she became aware of Ms. Short's serious medical condition. That recognition should have concluded the analysis and led the district court to deny the motion after it made this observation.

Instead of stopping there, the district court took its analysis one step too far by asking, and apparently answering, the question: does Defendant have defenses against this claim? In doing

21

so, the district court inferred that Sgt. Morgan could have, and did rely on some medical providers actions later in time, which somehow excused her constitutional violations. (App. pp. 1896-1897, 1950). Sgt. Morgan cannot pretend like she relied on a medical care provider's advice because the nurse did not see Ms. Short until about noon. That was about 11 hours after Sgt. Morgan should have called Daymark and 4 or 5 hours after Sgt. Morgan left at the end of her shift. Sgt. Morgan never relied on any medical provider's advice about Ms. Short.

Other jail staff and medical providers may have also violated Ms. Short's constitutional rights while she was at the Jail. That does not mean Plaintiff did not adequately allege violations committed by Sgt. Morgan. The district court should not draw inferences and "make a defendant's affirmative defenses for her" when considering a motion to dismiss. Mays, 992 F.3d at 305.

Even if the district court could raise affirmative defenses for Sgt. Morgan, the fact that a detainee is seen later by some medical care provider does not necessarily exonerate a prison guard or insulate her from the consequences of her own actions. This is like the Iko case where the Fourth Circuit allowed a claim of deliberate indifference to proceed to the Jury when the guards knew that an inmate was at risk of a particular medical problem and then disregarded the safety rules and policies that told them

22

how to provide adequate care to that inmate. Iko v. Shreve, 535 F.3d 225, 241-43 (4th Cir. 2008).

The Court did not hold those guards to some heightened level of providing direct medical care like a doctor should have. But, they did at least have to follow the minimum standards expected of them per the prison's rules and guidelines. See Booker v. S.C. Dep't of Corr., 855 F.3d 533, 546 (4th Cir. 2017)(finding regulations and guidelines provide evidence of what was reasonable when denying summary judgment and allowing a claim to proceed).

Those guards failed to affirmatively deliver that inmate into the care of a qualified health care provider. They also failed to explain the inmate's medical issues to a qualified health care provider. Iko, 535 F.3d at 241-43. After viewing the facts in a light most favorable to the inmate, the Court held that a Jury could find that those guards acted with deliberate indifference to the inmate's serious medical condition when they failed to follow these minimal requirements found in the prison policies.

Here, Sgt. Morgan failed to deliver Ms. Short into the hands of a QMHP or to provide appropriate information to other medical providers and her colleagues. From 1:30 a.m. until her shift ended at 7 a.m. on the morning of August 23, 2016, Sgt. Morgan knew, at least, that Ms. Short:

1) had recently tried to commit suicide within the past 90 days,

23

2) had been hospitalized for four days for that suicide attempt,

3) had been arrested for a physical fight with her husband,

4) was within the first 24 hours of incarceration,

5) abused drugs and alcohol regularly, and

6) was either intoxicated on or withdrawing from drugs and alcohol.

According to the policy and her training, Sgt. Morgan had a duty to identify each one of these suicide risks, and even more so in the aggregate. Then Sgt. Morgan had a duty to call Daymark directly to refer Ms. Short for a mental health evaluation by a QMHP. While she should have called Daymark hours earlier, Sgt. Morgan should have at least affirmatively told the nurse and the next incoming sergeant about Ms. Short's overt suicide risks when they started their shifts the next morning around 7 a.m. before her shift ended.

Even absent all those other things she should have done, at a minimum, Sgt. Morgan should have placed Ms. Short on suicide watch or even precautions. Sgt. Morgan should have marked the mental health screening form as "referred." This would have alerted everyone in the Jail that Ms. Short had overt suicide risks. Sgt. Morgan knew that she should have done all of these things, but she failed to do any of them. She knew but ignored her duties.

These failures and derelictions of duty had serious consequences. Sgt. Morgan's failure created a cascading series of

24

events in a chain reaction that led to an unevaluated, isolated, depressed, recently suicidal and hospitalized woman suffering from mental illness and withdrawal being left alone for at least thirty minutes at a time with a rope-like bedsheet in a room full of tying-off points being observed by officers who had no clue about the suicide risks that Sgt. Morgan objectively knew.

A Jury could decide that Ms. Short would not have been able to commit suicide if Sgt. Morgan had done any one of these things as she should have, much less some combination of them, before she left the Jail at 7 a.m. on August 23, 2016:

a.  called Daymark;

b.  placed Ms. Short on suicide watch or even just mental health observation;

c.  told the nurse about the positive screen and followed up to ensure the nurse called Daymark;

d.  filled out the mental health screening form properly and marked the "referred" box so the nurse could know to call Daymark on her own;

e.  told the oncoming sergeant about the known risks of suicide exhibited by Ms. Short;

f.  told her supervisor or anyone else about the known risks of suicide exhibited by Ms. Short; or

g.  written down any notes anywhere, including on the whiteboard at the booking station, about Ms. Short's suicide risks.

Recently, this Court reversed a trial court's grant of a motion to dismiss a § 1983 action against county jail officers by the estate of a pretrial detainee who died in a county jail. Mays,

25

992 F.3d at 305. The Court found that the allegations in the complaint provided enough details for the defendant officers to understand the claims of deliberate indifference for failing to provide adequate medical care to the deceased detainee. In that case, the trial court erroneously drew inferences in support of the defendants' positions instead of drawing all conclusions to the benefit of the non-moving plaintiff.

A plaintiff does not need to include a defendant's direct quote confessing liability in his complaint to satisfy the Iqbal and Twombly standard to proceed. Id. This Court noted that logical inferences based on the pleaded facts led to the conclusion that the defendants knew, or should have known, about the serious need for medical attention for that severely intoxicated detainee. That was a logical inference even if the plaintiff could not point to the defendants specifically admitting wrongdoing.

This Court allowed the claims to continue because a trial court should not consider a defendant's denial of allegations in pleadings to support a motion to dismiss: "There may well be factual disputes about the content or source of the [alleged fact showing the officer's knowledge of the problem]. And the [defendant] officers may dispute their knowledge of it and of [plaintiff's underlying medical problems requiring attention]. But those questions and others are for summary judgment or trial." Id. Put simply, a defendant will have her chance to dispute the

26

allegations in the complaint, but that time is not in a motion to
dismiss. At this stage, a court must not only assume the
allegations are true, but also draw all inferences for the benefit
of a plaintiff.

Similarly, in this case, Plaintiff alleged in the Amended
Complaint that Sgt. Morgan had actual knowledge of what her
obligations and duties were from her training, the mental health
screening form, and the Sheriff's suicide policy. Plaintiff also
alleged that Sgt. Morgan specifically knew about Ms. Short's
suicide risks from, among other reasons, the recent suicide attempt
and intoxication or withdrawal from drugs and alcohol. (App. pp.
151-154, 164-169). Plaintiff specifically alleged: "Based on the
proper application of the instructions, Sgt. Morgan should have
referred [Ms. Short] for further mental health evaluation. For
some inexplicable reason, she did not." (App. p. 153), and "Sgt.
Morgan either chose to not pay attention to this safety measure
when she should have been doing her job, or even worse, she paid
attention, but simply did not care, and chose to ignore the simple
instructions. Either way, Sgt. Morgan's choice led to Victoria's
death." (App. pp. 153-154).

Plaintiff also alleged that Sgt. Morgan knew about Ms. Short's
need for appropriate medical care, but just ignored it. (App. pp.
154, 165-170, 177-181). Plaintiff alleged that Sgt. Morgan failed
to follow her training, the instructions and policy on the mental

27

health screening form, or the Sheriff's suicide policy when she became aware of a detainee who exhibited suicide risks like Ms. Short. Plaintiff alleged that Sgt. Morgan failed to comply with applicable laws and codes, failed to perform her assigned duties, and that all of these failures led to Ms. Short's death. (App. pp. 177, 181). Sgt. Morgan may deny them, but Plaintiff included those allegations in the Amended Complaint. The inferences to be drawn from them support Plaintiff's claims.

A complaint need not fully provide all of the evidence that will eventually be shown to a Jury at trial to prove a claim. It just needs to put a defendant on notice of the claims against her. Sgt. Morgan knows what she did to Ms. Short on August 23, 2016. After reading the Amended Complaint, Sgt. Morgan knows that she will have to explain why she unreasonably ignored the safety steps and reasonable actions she could and should have taken for Ms. Short based on her training, the law, and the policies.

Sgt. Morgan has even had the opportunity to move for summary judgment based on the admissible evidence developed after a full inquiry into the truth of what happened during discovery. (App. pp. 910-912). In his Response, Plaintiff has provided sufficient evidence that a Jury could find that Sgt. Morgan violated Ms. Short's constitutional rights under 42 U.S.C. § 1983 at trial. (App. pp. 1010-1051). Thus, the district court should have denied

28

Sgt. Morgan's Motion for Summary Judgment, so it certainly should not have granted her motion to dismiss.

The colonists specifically cited "For depriving us, in many cases, of trial by jury" as one of the enumerated grievances giving rise to America's Declaration of Independence from England. The Founding Fathers enshrined the right to a jury trial in the Seventh Amendment in the Bill of Rights: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." Plaintiff is entitled to have a Jury hear and consider the genuine disputes about these material facts and decide this case as guaranteed by the Constitution. Ignoring the fully-developed admissible evidence at this point is antithetical to the search for truth and justice.

Almost certainly, a district court has discretion to consider a motion for judgment on the pleadings after the filing of a motion for summary judgment that provides full evidentiary support of a plaintiff's claims. But the question is: why do that? What possible reasons are there for not looking at the actual evidence to see if a plaintiff actually found evidence to support the claim once it has been fully developed in discovery and briefed?

Considering summary judgment arguments at this point would not eviscerate Rule 12(c). It would instead properly recognize

29

that different levels of review and evidence exist at different stages of litigation. Pleadings are integral at a certain stage of a lawsuit, but they have a shelf life.

Rule 12(d) actually contemplates this situation: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Certainly, that Rule 12(d) conversion to a Rule 56 motion could, and perhaps should, apply here. The time for blind reliance on stale pleadings, while ignoring actual facts that a Jury would hear at trial, has expired in this case. Ignoring the truth learned from these facts and admissible evidence, improperly exalts process over justice.

<u>CONCLUSION</u>

The district court erred in granting Defendants' Motion for Judgment on the Pleadings. The allegations in the Amended Complaint support a plausible claim that Sgt. Morgan violated Ms. Short's constitutional rights, especially when the actual admissible evidence provided in the summary judgment briefs are considered. Plaintiff respectfully requests that this Court reverse and remand for further proceedings for the § 1983 individual capacity claim against Sgt. Morgan, the official capacity <u>Monell</u> claims against

the Sheriff's Department, and the state law claims against all remaining Defendants.

Respectively submitted, this 23rd day of June 2021.

/s/ W. Ellis Boyle
W. Ellis Boyle
Attorney for the Plaintiff
Knott & Boyle, PLLC
4800 Six Forks Road, Ste 100
Raleigh, NC  27609
Email:  ellis@knottboyle.com
Telephone:  (919)783-5900
Fax:    (919) 783-9650
NCSB#:  33826

31

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this brief complies with Fed. R. App. P 32(a)(7) and Local Rule 32(b). Appellant is filing this electronically without serving any paper copies because the Fourth Circuit suspended the requirement of serving any paper copies of formal briefs and appendices pursuant to the current Public Advisory Regarding Operating Procedures in Response to COVID-19 issued by the Fourth Circuit on May 11, 2020.

This 23rd day of June 2021.

/s/ W. Ellis Boyle
W. Ellis Boyle

## CERTIFICATE OF SERVICE

I have this day caused to be filed with the Clerk, United States Court of Appeals for the Fourth Circuit, the foregoing Opening Brief of Appellant electronically using the Court's CM/ECF system which will send notification of such to counsel below:

> James R. Morgan, Jr.
> Rudolf Garcia-Gallont
> Womble Bond Dickinson (US) LLP
> One West Fourth Street
> Winston-Salem, NC  27101
> Telephone: (336) 721-3710
> Facsimile:  (336) 733-8394
> Email:  jim.morgan@wbd-us.com
>         rolf.garcia-gallont@wbd-us.com
> *Attorney for Defendants:*

This 23rd day of June 2021.

> /s/ W. Ellis Boyle
> W. Ellis Boyle

33